IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWIN CABRERA, KEVIN CAMORLINGA, AUSTIN RICHARD, ANDREW SKALAK, and MARK SULLIVAN, on behalf of themselves and all other similarly situated individuals,<br><br>　　　Plaintiffs,<br><br>v.<br><br>LEDGER SAS,<br><br>　　　Defendant. | Case No. 24 C 182<br><br>Hon. LaShonda A. Hunt |
| GOR GEVORKYAN, POONAM GUPTA, and ERIC MOLINA, on behalf of themselves and all other similarly situated individuals,<br><br>　　　Plaintiffs,<br><br>v.<br><br>LEDGER SAS,<br><br>　　　Defendant. | Case No. 24 C 1825<br><br>Hon. LaShonda A. Hunt |
| ALI BANAI, ZACHARY BRUCE, STEVEN CHU, and JORGE TAYLOR, on behalf of themselves and all other similarly situated individuals,<br><br>　　　Plaintiffs,<br><br>v.<br><br>LEDGER SAS,<br><br>　　　Defendant. | Case No. 24 C 2052<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring these three related putative class actions against Defendant Ledger SAS asserting that Defendant fraudulently misrepresented the security features of its cryptocurrency

1

hardware wallet products. Defendant moved to dismiss Plaintiffs' complaints under the doctrine of *forum non conveniens*, arguing that the claims should be litigated in France. For the reasons discussed below, Defendant's motions are denied.

## BACKGROUND

Plaintiffs are residents of Illinois, California, and New York. (IL Compl. ¶¶ 9-13, Dkt. 1; CA Compl. ¶¶ 9-11, Dkt. 1; NY Compl. ¶¶ 9-12, Dkt. 1).[1] Defendant is a company headquartered in France that designs, manufactures, and sells cryptocurrency hardware wallets called the "Nano S" and "Nano X". (IL Compl. ¶¶ 14, 39, 42). Defendant also writes and updates the firmware and software for its products, including an application called Ledger Live that allows users to buy and sell cryptocurrency. (*Id.* ¶¶ 43, 98). Defendant sells hardware wallets directly on its website and through distributors, online platforms and retailers, and brick-and-mortar retailers. (IL Mathias Decl. ¶ 6, Dkt. 31-1).

Cryptocurrencies are digital forms of money. (IL Compl. ¶ 30). Owners of cryptocurrency have control over it through alphanumeric codes (long strings of letters and numbers) known as "private keys." (*Id.* ¶ 32). Private keys can be mathematically derived from "seed phrases," which are collections of words often used to create multiple private keys associated with a cryptocurrency wallet—a seed phrase is like a master key for private keys. (*Id.*) Anyone who learns a private key or a seed phrase can steal all of the cryptocurrency associated with it. (*Id.*) As a result, cryptocurrency owners often use physical devices called "hardware wallets" to create, store, and use private keys to facilitate transactions, all without exposing the keys to third parties. (*Id.* ¶ 37).

---

[1] Citations to the docket in each case will be abbreviated with prefixes as follows: Case No. 24 C 182, "IL"; 24 C 1825, "CA"; and 24 C 2052, "NY". The filings are materially identical to each other in most respects, so the Court will cite to documents in the lowest-numbered "IL" case unless a difference is worth noting.

Defendant's Nano S and Nano X hardware wallets include two computer chips, one that stores private keys internally and one that connects the wallets to the outside world. (*Id.* ¶ 40). Starting in 2016, Defendant advertised their hardware wallets by stating that the private keys are stored on the devices only and never leave the device, meaning that they cannot be accessed by third parties, including Defendant, via the internet or otherwise. (*Id.* ¶ 49). Based on these statements regarding the security features of the products, Plaintiffs purchased Defendant's hardware wallets. (*Id.* ¶¶ 7, 9-13). Now, however, Plaintiffs believe these statements were false because Defendant released a firmware update in May 2023 that allowed Nano S and X owners to extract seed phrases from their devices online to create backups. (*Id.* ¶ 54). After announcing the update, Defendant stated the following in a now-deleted Twitter post: "Technically speaking it is and always has been possible to write firmware that facilitates key extraction. You have always trusted Ledger not to deploy such firmware whether you knew it or not." (*Id.* ¶ 57).

Except for Plaintiffs Skalak, Chu, Banai, and Sullivan,[2] all other Plaintiffs purchased their hardware wallets directly from Defendant through its website and agreed to its Sales Terms and Conditions with the following clause:

> Any dispute relating to the application or interpretation of these TC's which [cannot] be solved amicably will be brought before the French court with material and territorial jurisdiction, in accordance with the legal and regulatory provisions in force . . .

(IL Mathias Decl. ¶¶ 18-24). In addition, Plaintiffs who have used Defendant's Ledger Live application agreed to its Terms of Use. (*Id.* ¶ 8). Although owners of Defendant's hardware wallets

---

[2] Plaintiffs Skalak and Chu purchased their hardware wallets from Defendant through Amazon, (IL Compl. ¶ 12; NY Compl. ¶ 11), and are therefore not bound by the terms of the Sales Terms and Conditions. In addition, the Sales Terms and Conditions in place at the time Plaintiffs Banai and Sullivan purchased their hardware wallets included a forum-selection clause that did not refer to French court and instead stated that any dispute be brought "before the court with jurisdiction over the material and territorial matters pursuant to the applicable laws." (August 2022 Sales Terms & Conditions at PageID # 270, Dkt. 31-7). These differences are not material to the outcome of this decision, so no further discussion is required.

are prompted to download the Ledger Live application during the setup process for the device, the application is not required to use a hardware wallet. (*See generally* IL Frawley Decl., Dkt. 35-1). At all relevant times, the Ledger Live Terms of Use have included the following clause:

> Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding noncontractual obligations arising out of or relating to it shall be referred to and finally resolved by the competent courts of Paris, France.

(*Id.* ¶¶ 13-16). In addition, at all relevant times, the Sales Terms and Conditions have stated that they are "subject to" French law and the Ledger Live Terms of Use have stated that they are "governed by" and "interpreted in accordance with" French law. (*See, e.g.*, Oct. 27, 2018 Sale Terms and Conditions at 216, Dkt. 31-4; Dec. 10, 2019 Ledger Live Terms of Use at 191, Dkt. 31-2).[3]

Plaintiffs filed these essentially identical lawsuits against Defendant in Illinois, California, and New York on January 8, 2024. (IL Compl.; CA Compl.; NY Compl.) Based on the theory that Defendant made fraudulent misrepresentations about the security of private keys and seed phrases on its hardware wallet products, Plaintiffs asserted claims under their respective state-consumer protection statutes, for unjust enrichment, and for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5)(A).[4] (*Id.*) After the cases were filed, counsel for Plaintiffs and Defendant exchanged introductory emails, met initially via telephone, and then continued emailing about service of process and other preliminary issues. (IL Stabile Decl., Ex. 1, Dkt. 36-1). Through those communications, the parties agreed to transfer and consolidate the actions in one district,

---

[3] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

[4] The CFAA claim is asserted in the Illinois case only.

4

"subject to [Defendant] reserving all [its] defenses, except service and personal jurisdiction[.]" (*Id.*) The parties then filed joint motions in the California and New York cases, seeking to transfer venue to Illinois under 28 U.S.C. 1404(a). *Banai v. Ledger SAS*, No. 24 C 132, Dkt. 20 (S.D.N.Y Mar. 1, 2024); *Gevorkyan v. Ledger SAS*, 24 C 128, Dkt. 25 (N.D. Cal. Mar. 1, 2024). In each of the joint transfer motions, the parties stated:

> Transferring and consolidating the Ledger Cases in the Northern District of Illinois, under the Parties' agreement, promotes convenience. As noted, litigating in one forum instead of three will save the Parties and the federal court system from redundant discovery and duplicative legal filings. It will also conserve the Parties' resources. Defendant Ledger SAS is headquartered in France and will—if the cases are ultimately consolidated—only need to litigate in one foreign forum. Plaintiffs in the Ledger Cases are spread out across the United States, and the Northern District of Illinois is centrally located among them.

*Id.* (footnote omitted). Once the California and New York courts transferred the cases to Illinois as planned, the parties moved to reassign and consolidate the cases as related and the Court approved their request. (IL Order, Dkt. 21). Then, in their initial status report, the parties identified whether these actions should be dismissed on the basis of *forum non conveniens* as a major legal issue in the case. (IL Joint Status Report, Dkt. 26).

## **DISCUSSION**

Defendant moves to dismiss each case on the basis of *forum non conveniens* pursuant to the forum-selection clauses in the Sales Terms and Conditions and Ledger Live Terms of Use. (IL Mot., Dkt. 30; CA Mot., Dkt. 39; NY Mot., Dkt. 34). According to Defendant, the forum-selection clauses allow Plaintiffs to bring their claims in France only. Plaintiffs object, first contending that Defendant should be judicially estopped from seeking dismissal on the basis of *forum non conveniens* because Defendant previously agreed to transfer the California and New York cases to Illinois for convenience. Second, Plaintiffs dispute whether the Sale Terms and Conditions and

5

Ledger Live Terms of Use are applicable to their claims. Finally, Plaintiffs maintain that Illinois is the proper forum under a traditional *forum non conveniens* analysis. The Court will address each issue in turn.

I. **Judicial Estoppel**

Under the equitable doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Although there are no "inflexible prerequisites" that apply to the judicial estoppel analysis, relevant factors include whether a party has asserted "clearly inconsistent" positions, if a court has "accept[ed] that party's earlier position," and the unfair advantage or detriment resulting from the party's position. *Id.* at 750-751. Application of the doctrine is "especially" appropriate where acceptance of a party's inconsistent position would "prejudice" an opposing "party who has acquiesced in the position formerly taken." *Id.* at 749. Put another way, "[i]f the defendant tells the plaintiff that he is content with the venue of the suit, or by words or actions misleads the plaintiff into thinking this or the court into becoming involved in the case so that there would be wasted judicial effort were the case to be dismissed to another forum, or if he stalls in pleading improper venue because he wants to find out which way the wind is blowing, then conventional principles of waiver or equitable estoppel come into play and if invoked by the plaintiff block the challenge to venue." *Paradigm Equip. Fin., Inc. v. Peterson Med. Surgi-Ctr., S.C.*, No. 18 C 2284, 2019 WL 339596, at *2 (N.D. Ill. Jan. 28, 2019) (quoting *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 887-888 (7th Cir. 2004)).

The "discrete doctrine" of judicial estoppel applies to bar parties from taking clearly inconsistent positions both in successive suits and in the same litigation. *See, e.g., New Hampshire*, 532 U.S. at 749 (estopping party from taking position in 2000 litigation regarding river boundary that was inconsistent with position taken in a 1970s case); *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547 (7th Cir. 1990) ("The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation[.]"); *Paradigm Equip.*, 2019 WL 339596, at *2 ("Defendants admitted [in their answer] that venue was proper and . . . litigated the case here for nearly a year. Having lulled both plaintiff and the Court into believing they had no objection to this venue, defendants cannot object to it now.").

The circumstances in these cases do not warrant application of the judicial estoppel doctrine. During initial conversations between counsel, Defendant was careful to reserve all defenses, except service and personal jurisdiction. There is no reason to believe that a defense based on *forum non conveniens* was not included within the parameters of that broad reservation. In the joint motions to transfer, the parties stated that transfer and consolidation would promote convenience and save resources. That statement could reasonably be read, from Defendant's perspective, to mean that it would be more convenient and efficient to address all issues, including preliminary ones like the proper forum, in a single venue instead of three. At the same time, Plaintiff's understanding of the statement to mean that it would be more convenient to litigate the cases from beginning to end in one venue is also not unreasonable. Similarly, the statement that litigating in only one as opposed to three foreign fora would be more convenient for Defendant is

7

true when applied to this motion practice or the entire case. Although the joint motions also mention discovery, which suggests that the parties contemplated that the case would remain here beyond the pleadings stage, that statement can be viewed as conditioned upon the result of any defenses first asserted by Defendant. Indeed, if Defendant were to prevail on another dispositive defense (which Plaintiffs do not dispute to have been reserved), discovery might become irrelevant in that instance as well. In sum, Plaintiffs have not pointed to any words or actions by Defendant that are "clearly inconsistent" with its assertion of the *forum non conveniens* defense at this early stage in the case. As a result, any advantage gained or detriment suffered is not unfair, as Defendant is within its rights to take this position. Sure, Defendant could have been more forthright with Plaintiffs about its intentions, but litigants are not required to show all their cards. For these reasons, the Court concludes that judicial estoppel does not bar Defendant's *forum non conveniens* argument.

**II.** *Forum Non Conveniens*

Under a traditional *forum non conveniens* framework, courts determine whether an adequate alternative forum is available to hear the case, weigh certain private and public interest factors, and recognize a strong presumption in favor of a plaintiff's choice of forum. *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 524 (7th Cir. 2001). But if a plaintiff's claims fall within the scope of a mandatory forum-selection clause, courts apply a modified approach under which the plaintiff's choice of forum bears no weight, the burden falls on the plaintiff to establish that dismissal in favor of the bargained-for forum is unwarranted, the parties' private interests are irrelevant, and the original venue's choice of law rules are not considered. *Nulogy Corp. v. Menasha Packaging Co., LLC*, 76 F.4th 675, 680 (7th Cir. 2023). The threshold issue then, is whether the forum-selection clauses in the Sales Terms and Conditions and Ledger Live Terms of Use apply to Plaintiffs' claims and require that they be brought in France. Before conducting that

8

inquiry, however, the Court must consider the question of whether American or French law governs interpretation of the forum-selection clauses.

A. **Applicable Law**

If a contract contains a choice of law clause, then the law designated in that clause should be used to determine the validity of a forum-selection clause in the same contract. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014) ("In contracts containing a choice of law clause, therefore, the law designated in the choice of law clause would be used to determine the validity of the forum-selection clause."); *Abbott Lab'ys v. Takeda Pharm. Co.*, 476 F.3d 421, 426 (7th Cir. 2007) ("Simplicity argues for determining the validity and meaning of a forum-selection clause . . . by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears . . . rather than making the court apply two different bodies of law in the same case."); *cf. Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438 (7th Cir. 2012) (finding that the parties had waived a choice of law provision requiring application of Mexican law by framing their dispute under American law); *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008) (applying the holding from *Abbott* that "the validity of a forum-selection clause depends on the law of the jurisdiction whose rules will govern the rest of the dispute" to conclude that Illinois law governed the validity of a jury waiver provision in a contract); *but see Warner v. St. John's Nw. Mil. Acad. Inc.*, No. 18-CV-730-JPS, 2019 WL 403718, at *3–5 (E.D. Wis. Jan. 31, 2019) (noting that application of law required by the choice of law provision in a contract would result in what the Seventh Circuit sought to avoid in *Jackson* and *Abbott* (i.e., application of different jurisdictions' laws to substantive and procedural issues) but ultimately determining that the distinction was irrelevant because the forum-selection clause was enforceable under either federal or state law).

Plaintiffs argue that the choice of law provisions of the Sales Terms and Conditions and Ledger Live Terms of Use are applicable while maintaining that the forum-selection clauses contained in the same agreements are not. Plaintiffs point to the language stating that the agreements are "subject to" or "governed by" and "in accordance with" French law and assert that France's consumer friendly rules of interpretation should apply. (Resp. at 306, Dkt. 35). According to Plaintiffs, *Jackson*, *Abbott, Adams*, and *IFC* all support their position. Defendant attempts to distinguish those cases by noting that none applied international law to interpret a foreign forum-selection clause. Furthermore, Defendant argues that if the Court were to apply French law here, it would result in what *Abbott* sought to avoid—the application of two different bodies of law. Defendant also argues that the choice of law language of the agreements in non-exclusive and that French courts generally apply the substantive law of the territory where consumers reside.

As an initial matter, the Court disregards the choice of law provision contained in the Ledger Live Terms of Use. Plaintiffs' claims simply do not fall within the scope of that agreement. Although Plaintiffs' complaints reference Ledger Live for context and several Plaintiffs were in fact users of the Ledger Live application, the claims in these actions arise from Defendant's alleged misrepresentations and Plaintiffs' purchase of Defendant's hardware wallets, not their use of Ledger Live. The Ledger Live Terms of Use are limited to claims arising out of or related to that agreement, which itself relates to Ledger Live only.

With respect to the Sales Terms and Conditions, the choice of law provision simply states that "These TC's are subject to French law." Of course, the agreements are "subject to" French law—Defendant is a company based in France. But a company advertising in and selling and shipping products to the United States is also "subject to" American law in connection with those transactions. It appears that Defendant understood this because the corresponding Ledger Live

10

Terms of Use provision states that "These terms will be governed by and interpreted in accordance with the laws of France." But being "subject to" laws is not the same as being "governed by and interpreted in accordance with" them. The choice of law provision in the Sales Terms and Conditions is therefore non-exclusive in that it states that they are "subject to" French law but not that French law must be applied exclusively instead of other sources of applicable law.

Without a choice of law provision requiring the law of any particular jurisdiction, the Court follows the guidance of *Abbott* and *IFC* in concluding that the application of federal law on forum-selection clauses is appropriate here. Plaintiffs' claims arise under a federal statute and three states' statutes and common law. Rather than sifting through the nuances of each states' laws on the issue, "simplicity argues" for the application of federal law in order to avoid the application of multiple different bodies of law in the same case.

### B. Applicability of Forum-Selection Clause

In evaluating the applicability of a forum-selection clause, courts consider the scope of the clause based on its language and the nature of the claims brought by the plaintiff. *See IAC/InterActiveCorp v. Roston*, 44 F.4th 635, 641 (7th Cir. 2022) (describing language of forum-selection clause covering claims "arising out of or related to this Agreement" as quite broad and then considering whether each claim falls within its scope). The forum-selection clause in the Sales Terms and Conditions applies to "any dispute relating to the application or interpretation of these TC's[.]"[5] This language is more limited in that it applies only to disputes relating to the application or interpretation of the agreement itself and not any dispute "arising out of or related to" the agreement.

---

[5] Again, it seems that Defendant is aware of how to use broader language if it wishes to do so because the forum-selection clause in the Ledger Live agreement covers "[a]ny dispute, controversy, difference or claim arising out of or relating to this Agreement[.]"

Plaintiffs' claims have nothing to do with the application or interpretation of the Sales Terms and Conditions. Rather, they relate to alleged misrepresentations made by Defendant in its advertising and are brought under state consumer protection statutes, equitable common law theories of unjust enrichment, and a federal statute. Although the claims arise from the purchase of Defendant's products, it does not appear at this juncture that resolution of any of these claims on the merits will turn on the application or interpretation of the Sales Terms and Conditions. While claims sounding in tort, statute, or other non-contractual theories can arise out of an agreement if they are based on violations of contractual obligations, that is not the case here. Plaintiffs' claims make no reference to an agreement or contract between the parties and are instead based on representations and other communications by Defendant about its products. Of course, Plaintiffs who purchased their hardware wallets directly from Defendant through its website agreed to the Sales Terms and Conditions. If the forum-selection clause were broader and covered "any dispute arising out of or related to" the Sales Terms and Conditions, then Plaintiffs' claims would likely be covered. But because the clause applies only to "dispute[s] relating to the application or interpretation" of the agreement, Plaintiffs' claims are outside its reach.

Before proceeding to the *forum non conveniens* analysis, it is worth briefly discussing why the Court's determination regarding the applicability of the choice of law and forum-selection clauses differs from that of the Ninth Circuit in *Baton v. Ledger SAS*, No. 21-17036, 2022 WL 17352192 (9th Cir. Dec. 1, 2022). In that case, the Ninth Circuit affirmed dismissal of the plaintiffs' case against Ledger (except for certain California consumer protection claims) on the basis that their data breach class action claims fell within the broad scope of the applicable forum-selection clause. *Id.* at *2. In reaching that conclusion, the court summarily stated that the three governing documents (Sales Terms and Conditions, Privacy Policy, and Ledger Live Terms of

Use) contained extremely broad forum-selection clauses providing French courts with exclusive jurisdiction and also included choice of law clauses applying French law. Citing only the language of the Ledger Live Terms of Use (which include provisions regarding data privacy and protection) and noting that the plaintiffs did not argue that their claims differed with respect to the other agreements, the court found that the broad "any dispute . . . arising out of or relating to" language encompassed the plaintiffs' claims. *Id.* The court did not examine or analyze the language at issue in this case in detail, as it does not appear to have been in dispute. *Id.*

As discussed above, Plaintiffs' claims in this action involve non-contract related misrepresentations and are therefore narrower and do not fall within the scope of the Ledger Live Terms of Use. Instead, only the more limited language of the Sales Terms and Conditions is potentially applicable. Having considered the language of the choice of law and forum-selection clauses of that agreement at a more-detailed level than the Ninth Circuit in *Baton*, this Court respectfully reaches the opposite conclusion that French law does not apply and Plaintiffs' claims fall outside the scope of the forum-selection clause based on the facts of this case. Thus, the Ninth Circuit's non-binding decision in *Baton* is neither directly analogous nor persuasive here.

C. **Traditional Analysis**

Having determined that no forum-selection clause applies to Plaintiffs' claims, the Court must conduct a traditional *forum non conveniens* analysis. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 (2013). Under the traditional framework, the first step is to determine whether the proposed alternative forum is adequate. Plaintiffs do not contest this issue, and the Court has no reason to question whether France would be an adequate forum. *See Harris v. France Telecom, S.A.*, No. 11 C 357, 2011 WL 3705078, *4-5 (N.D. Ill. Aug. 22, 2011) (finding France to be an adequate alternative forum despite differences in laws). In the second step, the Court "must weigh several private and public interest factors related to the proper location for the

13

litigation." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002). Private interest factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Atl. Marine*, 571 U.S. at 63 n.6 (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, n.6 (1981)); *see also Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008) (listing same factors, plus "[t]he enforceability of the judgment, if one is obtained") (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Public-interest considerations include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine*, 571 U.S. at 63 n.6 (quoting *Piper*, 454 U.S. at 241, n.6); *see also Clerides*, 534 F.3d at 628 (listing same factors, plus "the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law"; and "the unfairness of burdening citizens in an unrelated forum with jury duty.") (citing *Gulf Oil*, 330 U.S. at 508-509). As noted above, weight is given to the plaintiff's choice of forum throughout the analysis. *Id.* After weighing the factors, "a plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant." *Clerides*, 534 F.3d at 628.

The private interest factors weigh in Plaintiffs' favor. First, given that Plaintiffs are individuals residing in locations spanning the entire United States and Defendant is a company headquartered in France but with operations in the United States, it would be more of a burden for Plaintiffs to access sources of proof if the case were to proceed in France than it would be for Defendant to access sources of proof here. Second, the availability of a compulsory process to

14

compel the attendance of unwilling witnesses is neutral if not slightly in Plaintiffs' favor because witnesses will presumably include Plaintiffs themselves and Defendant's employees such that the compulsory process likely will not be necessary. As to the cost of obtaining attendance of willing witnesses, this factor also weighs slightly in Plaintiffs' favor because, although there will be travel costs wherever the case is tried because Plaintiffs are in California, Illinois, and New York and Defendant is in France, the costs for several individuals to travel to France is likely significantly more than the cost for some employees to travel to the United States. The availability of the premises for viewing is irrelevant and therefore neutral. The enforceability of a potential judgment is also neutral, as the Court has been given no reason to doubt that Plaintiffs would be able to pursue post-judgment collection efforts in either forum. If anything, this factor weights slightly in Defendant's favor, as it would probably be easier to enforce a judgment against a French company if it is issued by a French court. Finally, the practical problems of litigating in a foreign court are likely neutral. Whether litigated and tried in the United States or France, translation and interpretation services will likely be necessary, and the Court has no reason to believe that there would be a large disparity in either direction. Accordingly, on the whole, the private interest factors weigh in Plaintiffs' favor.

      Consideration of the public interest factors also favors Plaintiffs. Although the record is silent on the relative "court congestion" between this district and the relevant French court, this factor weighs slightly in favor of Plaintiffs. While these cases are still in the preliminary stages, they have been pending for over a year, transferred from three jurisdictions to one, and designated as related, so some efficiency is to be gained by continuing the litigation here instead of starting fresh overseas. The factors regarding local interest in deciding localized disputes at home, trying a diversity case in a forum that is at home with the governing law, and avoidance of conflicts of

law and application of foreign law all weigh strongly in Plaintiffs' favor. Although these cases are against a French company, they are brought by American citizens regarding alleged misrepresentations about products that were offered and sold in the United States. Most of the relevant alleged actions and injuries occurred here and are therefore more subject to local interest. In addition, the claims asserted arise primarily under state law that courts in this district are more at home with than a French court would be. If the case were litigated and tried in France, the courts there would have to apply the statutes and common law of three different foreign states and a federal statute, meaning that conflicts of law would inevitably arise. Last, although France surely has an interest in the alleged wrongdoing of one of its companies, it would be an unfair burden on the citizens of France to serve as a jury in a case involving events primarily occurring in the United States and injuries suffered by American citizens only. In sum, the public interest factors weight heavily in Plaintiffs' favor.

Finally, although the above factors clearly bolster Plaintiffs' choice of forum, the Court notes that the California and New York Plaintiffs are "not at home" in Illinois but that they agreed to this jurisdiction, albeit under the apparently misguided impression that Defendant would as well. Accordingly, to the extent those Plaintiffs are not at home, it is a non-issue. Having given due weight and consideration to Plaintiffs' choice of forum and the relevant private and public interest factors, the Court concludes that dismissal under the doctrine of *forum non conveniens* is not warranted and that the cases should proceed here.

## **CONCLUSION**

For the reasons stated above, Defendant's motions to dismiss for *forum non conveniens* are denied. By April 14, 2025, the parties are ordered to meet and confer and file a joint status report in the lead case (24 C 182): (1) confirming whether Defendant still plans to move for dismissal

16

under Rule 12(b)(6); (2) stating if the parties agree to a combined motion filed in the lead case including general arguments that apply to all three complaints and case and/or plaintiff specific arguments (instead of separate motions and briefs in each case); and (3) proposing an agreed briefing schedule with a motion deadline of May 2, 2025, at the latest and including any requests to exceed page limits.

**DATED**: April 4, 2025  **ENTERED**:

*LaShonda A. Hunt*

LASHONDA A. HUNT
United States District Judge

17